Good morning, Your Honor. May it please the Court, Mary Gabrielle Sprague representing the United States, and we would like to reserve Appellants a combined four minutes for rebuttal. You may. This Court's 1975 decision, Joint Tribal Council of the Passamaquoddy Tribe v. Morton, and its 1979 decision, Bottomley v. Passamaquoddy Tribe, set in motion negotiations that led to the Maine and Federal Settlement Acts in 1980. Through this appeal, the Penobscot Nation and the United States are seeking to preserve the benefit of the bargain that was made in those Settlement Acts. In the Federal Settlement Act, Mixa, Congress confirmed the existing Penobscot Reservation, which was the area reserved from session in the 1796 and 1880 Treaties with Massachusetts, but excluding any parcels that had subsequently been transferred. The question presented here is whether the Maine stem of the Penobscot River is within the confirmed reservation. We argue that it is, in whole or at least in part. Just to clarify something that I'm not sure, are you seeking to control the fishing in that river? Your Honor, if it is within the reservation, then the regulation of the fishing is by the Maine Indian Tribal State Commission, in our view. The tribal wardens and state game wardens would have joint authority to patrol the river. And if there is a judicial enforcement required for nonmembers, that is in state court. For So the tribe seeks to control it within the framework of the Settlement Act. How about navigation? Navigation is subject to the public servitude, and so navigation is unaffected. The tribe has never had the right to block access to the river, and is not seeking to block access at this point. Another question that I would like you to help me with is, you are relying in large part on Alaska Pacific, and it's ruling as to what islands means. In that case, I have tried to find, because it talks about surrounding waters. But nowhere that I can see is surrounding waters in that case defined, maybe it's in the record in that case, but to what extent the surrounding waters, how many miles out, how many yards out, or what have you? Your Honor, I do not know the answer to that question, and Mr. Smith for the nation might know. I'm afraid I don't know the territorial extent there. We are relying, of course, on not a reservation by the United States, but a confirmation of the reservation that was created by virtue of treaties with Massachusetts. This is really a question of statutory construction, isn't it? We start with the Settlement Act, that's correct, Your Honor. And if the language of the Settlement Act is clear, that's the end of it, isn't it? That's correct. We argue it's not clear. Okay. I just wanted to be sure we were starting And where the treaties come in is that the definition of the Penobscot reservation expressly references the reservation from the treaties with Massachusetts. Congress could well have put forth a standalone definition of the Penobscot reservation, but it did not. It has a definition by reference to what was reserved in the treaties with Massachusetts. We argue first that the district court erred in concluding and looking only at the definitions of reservation and looking at the specific words lands and islands and concluding that that meant only the uplands, not the submerged lands. There is not one single legal definition of island. It has to be interpreted in light of the state common law, and the state common law in Maine is an authority. Your argument is there is an ambiguity about the term island? Yes, Your Honor, that's correct. Would you explain that, please? Island, the legal boundaries of an island depend on the jurisdiction and the context within the jurisdiction. So that an island in the Susquehanna River in Pennsylvania would only go to the shores of the upland because in Pennsylvania The term island, which most of us have a certain understanding, your position is it varies state by state? It does, Your Honor, and in the state of Maine, island presumptively includes the surrounding submerged land, and how much submerged land depends on whether the island is in a tidal body of water. So you will concede that it would have been easy to say islands and submerged land out for whatever distance from the islands, and there is no such language? That's correct, Your Honor, but that is because the focus of the Settlement Acts was on what was ceded, an extinguishing claim of aboriginal title to the land that was ceded. The land that was reserved, which was the existing reservation, was not the focus of the Settlement Acts, and less attention was given to delineate the scope. I'm back to Judge Selye's point. The plain text seems to point in one direction, and you're trying to convince us not to rely on the plain language of the statute. Your Honor, we disagree that the plain language points in that direction, because when you consider the word island as a legal definition, it varies by state, and obviously here you would look to the common law context in Maine. Okay, that's argument one. Argument two is we have to somehow go back to the purposes of these statutes, and that's what I understood you just to be arguing, that the focus was not on the definition of island, the focus was on something else. If you accept our argument that you can't look at the definition in isolation, and that one can look at the definitions in the two acts, they are not isolated from each other, I don't know how you get from your premise to your conclusion. The statute needs to be construed as a whole, and importantly, there is the sustenance fishing right. It's not an off-reservation sustenance fishing right. It was intended to be a significant right. Unless the context indicates otherwise. It's explicit language on that point. Correct? That's correct, Your Honor, but the district court should have given, it's a better read of the statute, to look at the statute as a whole, and then the ambiguous word islands in the definition is given meaning by the fact that it has to include the sustenance fishing right, and the surrounding waters, which are at least the submerged lands of the threat. Okay, so the sustenance fishing in your view is, despite the language I just read to you, is the tail that's wagging the dog of the definition of island? That was a critical element of the bargain. So I've correctly characterized your argument? No, I don't think it is the tail. The sustenance fishing right is coterminous with the ability of the tribe to regulate hunting and trapping. That is all within the reservation. All right. Thank you. Smith? Mr. Smith? Yes. Good morning. Good morning, Your Honor. Kane Smith, Jr. for the Penobscot Nation. I'm here with my colleague, James Kelberth. This is an agreement. It's not just a statute. This was the settlement of a very significant land claim. But the settlement is consummated by the statute. Exactly, Your Honor. So are you disagreeing with the proposition that the plain language of the statute controls unless the statute itself is ambiguous? If there is ambiguity, because you cannot reasonably All right. So the plain language controls unless we find ambiguity. Plain language would control in a contract, just as it would in a statute, Your Honor. Correct. And there is ambiguity here, because if you confine the Penobscot's reservation to 160 plus island surfaces only, you have rendered meaningless the sustenance fishing right, because there's an extrinsic ambiguity. That extrinsic ambiguity is that there are no waters on any islands to support the fish. Then what is the meaning of the phrase, as the context so requires in the definition of reservation? I believe the phrase says, unless context provides otherwise, along those lines, right? So certainly, the way Judge Sengle read this, he found that he was constrained by the plain language. And so he took on the, unless context provides otherwise, and found that the sustenance fishing right had to be in the river, bank to bank, because that's where the tribe had always exercised these rights. And the same goes for hunting. But the phrase, you know, unless context requires otherwise, whatever the exact words are, that had to have some purpose. And it seems to me the conclusion that that purpose was a mission of the term island, or of the term reservation, either one, is not an illogical conclusion on Judge Sengle's part. Whether Judge Sengle should have reached that issue was a different question. Right. Every breath that was uttered in terms of this ironing out this agreement, which contained hunting, trapping, and fishing in the same breath. In other words, the tribe has always, since time immemorial, exercised these traditional, culturally important sustenance hunting, trapping, and fishing rights in the reservation. They're not only their sustenance resources, but they're their cultural resources. And the promise, the one obvious consideration that the state gave up after this court's decision in Bottomley, which established the tribe's ability to control these culturally important sustenance resources. And those are in and on the Penobscot River. Just logically, I'm trying to set up the framework for the decision. I take it in response to your opponent's arguments that the question of the extent of the sustenance fishing rights, they say it's not right. You don't have standing. You would say, regardless of that, on the first point, the interpretation of the term islands, that we have to look at the sustenance fishing. Am I correct about that? Absolutely, Your Honor. Okay. Absolutely. If their position is correct. And first of all, there's clearly a controversy. As soon as Attorney General Schneider issued his August 8, 2012 letter in jeopardy, the tribe's existing laws governing its sustenance fishing, including taking of Atlantic salmon, as well as tradition. Well, this is not a statutory standing question. It's a sort of Article III. Right. The Supreme Court just, in the Miami case, looked at a statute and gave a fairly broad reading of standing. You don't get the benefit of that here, because this is a pure Article III question. Agreed? Well, I'm not sure I understand your distinction, Your Honor, but I think it's under the Mo decision footnote 7, which we cited, what has been put in jeopardy is Congress's protection of tribal self-government, which was the sustenance fishing right and authority here. And as soon as that letter issued, that opinion issued, it put in jeopardy laws that we had on our sustenance that we had issued. Okay. So I think Am I correct that under the common law, Massachusetts, and there you go, Maine, because it was part of Massachusetts, the owner of a budding land on a river also owns the bottom? Yes, Your Honor. That's exactly the rule, in fact. And that's still the law today? Yes, it is. Now, was that ever ceded by the Indians when they allegedly sold the land to, in violation of the Intercourse Act? No, Your Honor. The language of a treaty, and this is also known as a treaty substitute, when you have an agreement that's ratified by Congress, the Supreme Court has called it a treaty substitute. The rules of treaties abide, and under those time-tested rules, a tribe only cedes what is expressly ceded in a treaty. Everything else is retained. So the settlement basically was limited to those areas that had been ceded? Exactly, Your Honor. That was the question. Your argument is that they never ceded the, I'll call it riparian rights for lack of a better term. Sure. If you look at it through the eyes of Massachusetts and Maine law, which is an odd way to look at it because under principles of federal Indian law, you're required by the Supreme Court's decision to look at it through the eyes of the tribe, a reasonable understanding of the tribe, then in no uncertain terms, the tribe never ceded the bed of the reservation. There was a present reservation at the time of the settlement, and that was everything that the tribe had retained and not ceded. That wasn't the subject of Congress's settlement act here. Everyone knew that that existed. And Congress made a promise, critical promise. It's in paragraphs 2, 7, and 9 of the Identical Committee Reports that it set out as special issues. It said that pursuant to this court's decision and bottomly, these sustenance, hunting, trapping, and fishing rights and related authorities are inherent, retained, sovereign authorities, expressly retained. There's no place to identify those primeval rights. And this court addressed it. Judge Lynch addressed it in Aristocrat of Mi'kmaqs v. Ryan at 484 F. 3rd at page 57. Judge Selya addressed it in Narragansett Indian Tribe v. Rhode Island at 19 F. 3rd at pages 694 and 701. It is well established by this court that these are preexisting rights and authority. The only place to locate those are in the tribe's aboriginal domain, which Congress described as centered on the Penobscot River in its committee reports. These were solemn promises that Congress made to the Penobscot Tribes and the tribes were voiced about the confusing aspects of this settlement act. Thank you. Mr. Reed, good morning. Good morning, Judge Tarrea. In Mayplace Court, my name is Gerald Reed and I represent the state defendants in this case. This case is about whether the Penobscot Nation can regulate non-tribal activity on the Penobscot River. That is the state's concern. It is not a case about sustenance fishing. State officials have never interfered with sustenance fishing and have no intention of ever doing so. But the plaintiffs are trying to use this issue of sustenance fishing to do an end run around the definition of reservation that appears in the implementing act. But if non-Indians are allowed to fish on this river, doesn't that affect sustenance fishing? That's exactly what the settlement act provides for. Fishing has always occurred on this river as a matter of public right. I don't understand the plaintiff's position to be that they are seeking to exclude the public from fishing on the river. Well, they want to regulate, so if they want to exclude it, they will be able to. It would have fishing limits, etc., etc. If you have unlimited public access to the river, then you affect those that want to limit it. The sustenance fishing right, to spend just a moment on the scope of that right, is a limited right. It's a right to take what fish are there for personal sustenance. It's not a guarantee of any particular quantity of fish or quality of fish. So the fact that others may be using the resource, non-tribal fishermen, has no implication necessarily for whether the right is fully available to the tribe. So again, the nature of the question... Can you go ahead with overfishing? Of course, and the settlement act has protections built in for overfishing, but it's the inverse of what your question is suggesting. It's the IFW commissioner retains authority to So the definition of reservation as set forth in the implementing act reads in pertinent part, the islands in the Penobscot River. The core of that phrase and the core of the entire definition is that one word, islands, and everything that follows that word modifies in some way that single noun, island. But the statute doesn't give island its own definition. So the court should give it its ordinary meaning, its dictionary meaning. And Webster's defines island as a tract of land surrounded by water. How about Alaska, Alaska Pacific case? It's very distinguishable on the face of the language, your honor. The Alaska Pacific fisheries case involved language where the definition of reservation involved a quote, body of lands known as the Inet Islands. So the very definition of the reservation was invoking the public's understanding of what a region was known as. It's very different than the definition we have in the implementing act, which consists of a definition that is built around one word, islands, which has a common, easily understood meaning, whether it's in dictionary or by excluding everything but the uplands of the island. What do you say to the argument that islands doesn't have a common, universally understood meaning, but that its meaning differs from state to state? Well, again, I would say that because it's undefined in the statute, the court would ordinarily give it its dictionary definition. But there's a misconception that I've heard conveyed during the argument at this point, which is that the main common law defines or gives riparian rights or gives rights of land ownership to the riparian owner as a matter of course. That's not the way it works. The common law provides for rules of deed construction such that when the terms of the deed are ambiguous, there's a presumption that the submerged lands adjacent to the upland owner go with the upland owner's title. But only if the terms of the deed are ambiguous. It's incorrect to suggest that... Well, is that the case here? Is the deed being the agreement? Is that ambiguous in this respect? No. Two reasons. First of all, the deed here is the implementing act. There's no other language of the implementing act. The definition of reservation is unambiguous. But secondly... But wait a minute. It says islands. It says islands. Well, if it just says islands, then why would you apply the common law of Maine to that definition? For two reasons. First of all, because there's no ambiguity. And second of all, because rules  of statutory construction should be applied to interpret the settlement acts. And there's a good reason why. Because we're talking here about a jurisdictional context where it was critical that the drafters establish bright line jurisdictional boundaries through their definitional provisions. So falling back on rules of deed construction that may make sense in a private property transactional context do not necessarily make any sense when you are interpreting a statute whose entire purpose was to clarify the status of lands and natural resources in the state of Maine and remove the title that the Indian Land Claims presented. We needed a bright line boundary. And in the context of the reservation, that bright line boundary is the upland of the island. Otherwise, you would have a dilemma presented by the invisible line winding between the islands and the upland edges of the river that makes absolutely no sense from a practical standpoint. Nobody would be able to determine whose jurisdiction they were subject to when they're on the river. And there's no indication whatsoever in the legislative history that anybody intended that result. It also has the bizarre consequence of limiting the sustenance fishing provisions application to this small marginal water immediately adjacent to the islands, which, again, is not suggested in the legislative history anywhere. So this theory of what the U.S. calls the halo theory does not make any sense as a matter of statutory interpretation. It's unsupported in the legislative history. It's completely impractical. What about the district court's common sense notion that if you're going to talk about sustenance fishing, it has to mean something more than standing on the beach of an island and throwing out a fishing line or a net and then hauling it in? And I would emphasize, Your Honor, that the state has never had any concern about curtailing this practice. No, no, no. You misunderstand me. They're making two independent arguments. One has to do with sustenance fishing. You said about that there is no dispute before the court. Don't get into it. Their second argument is in interpreting the term island, it has to be viewed in terms of sustenance fishing because that's also a right they have. And the district court's common sense approach ultimately leads to a reinterpretation of the plain meaning of the term island. It's to that second argument that I'm asking you to respond. We believe, we urge the district court to consider reconciling those two provisions by limiting the sustenance fishing to island-based fishing as a matter of statutory interpretation only. As a matter of practice, the state has no concern about where the sustenance fishing is actually taking place. All right. Thank you. Apart from the definition of reservation, there is abundant evidence in the record, both from the legislative history, the facts, and the statute itself that supports the conclusion. I take it that's a fallback argument, that your initial argument is plain text resolves this. There is no need to refer to history. That is correct, Your Honor. But there are other provisions in the Settlement Act, getting to one of your questions previously, that, for example, use the term submerged lands where it was intended to have jurisdictional consequences in 6207.1b. The absence of that language in 6203.8 is significant. It creates a negative implication. The eminent domain provision 6205.3 talks about replacement lands, creating a preference for replacement lands that are contiguous to the Penobscot River, and deeming, for the purposes of that provision, land that is contiguous to the river to be contiguous to the reservation. That language absolutely makes no sense whatsoever under the plaintiff's theory, and they have no response for it. Consider that there were major hydroelectric projects existing in this river segment in 1980 when these laws were passed, and yet the legislative record has no indication that the owners of these projects expressed any concern about the fact that their investments would suddenly become part of an Indian reservation. That's because nobody understood that the river was part of the reservation in 1980. It's inconceivable that nobody would have made sure that their concerns were addressed in the statute had they any inclination that the entire river might be considered the reservation. The Department of Interior, in 1977, going into the Settlement Acts... I'm sorry, you can keep going if you want down that line of argument, but I'd like you to address the response to my question about ripeness, that the tribe is now under a threat as to its sustenance fishing rights as a result of the Commissioner's letter, and that is sufficient to address those standing and ripeness. Could you please reply to that? Yes, the uncontroverted record of this case shows that there is no threat whatsoever. Not a single tribal member testified that they were influenced in their sustenance fishing practices in any way by the Attorney General's opinion or any other action by any state official, so there's no evidence of any controversy. If you examine the Attorney General's opinion and the cover letter that accompanied it, it's very clear that the context for that is tribal authority over non-tribal activity. There's no mention of sustenance fishing, no indication that the state has any concern about it, and the testimony of the Colonel of the Warden's Service is that there's a long-standing policy of allowing this fishing to take place and no intention of revisiting it. So under this Court's decisions on ripeness, one of the formulations of that standard is whether the party's conduct would change tomorrow, and if the Court addressed the issue, there's no indication that there would be any change in the conduct of state officials or the tribe or tribal members, so the matter is not ripe for review. And the reason why the state is urging that that portion of the District Court's decision be vacated is because it's already creating mischief in another context, and I would draw the Court's attention to page 60 of our brief, note 34, which is a reference to an EPA, U.S. EPA action, which was announced shortly after the District Court decision came out, in which the EPA latched onto this idea that sustenance fishing under the Settlement Acts is no longer considered to be confined to reservations, and their interpretation of it is that it now applies anywhere that water touches Indian territories, which is a vast difference. It would convert a right that currently under the statute would apply to potentially a few thousand acres to one that could apply to hundreds of thousands of acres. So it's causing problems. That's why we are urging that that portion of the decision be vacated. Our concern is not the actual practices of tribal members who want to go out on the main stem of the river and fish. It's never been our concern. Thank you very much. Thank you. Thank you. Good morning, Ms. Connors. Thank you, Your Honor, and may it please the Court. I'd like to just respond to the first question that was asked, which was when you asked the United States about whether other people can fish on the river, and my understanding now is that the statement is that it's a joint regulation by MITSC, the Commission. That is not what they argued before, and it's not what they're arguing in their reply brief at page 16 to 17. There they argue under their common law theory that only the Penobscot Nation has, under their common law theory, a right to fish anywhere in the main stem. That's the point they're making at page 16 to 17. It's buried, but there it is. And we've had this fluctuating argument because of the vagueness of their descriptions of common law and its application here. It doesn't have any application here because they're talking about what main law is regarding ownership. The reservation is not owned by the nation. The reservation is owned by the state. It's held for the benefit of the nation, but it's owned by the state. So why we would be talking about ownership issues is unclear, and they've gotten main common law on ownership, which is incorrect. What is clear in main common law on ownership is that if you own the sides of the banks of a river, that you own to the thread. It's unclear what happens if there's an island in the middle. Now they say, they come up with this halo theory, where you're having 146 threads kind of spiraling out, which as the district court said is totally unworkable, was never suggested in 1980, and doesn't make any sense. But that's the theory. And the theory behind the bank-to-bank has to do with the claim that it was never ceded the bank, the bottom of the riverbed. And one of the problems with that theory is that it ignores the language of the Settlement Act that was extinguishing all claims with a broad definition of transfer. So to say that if it wasn't an express ceding of a specific piece of property, it's still retained in the aboriginal title of the nation, defies the basic premise of the Settlement Act. And just to get to the last question on the sustenance rights, which is the argument that you go beyond the plain text of the definition of having a sustenance right to fish on 146 islands is like having no sustenance right to fish at all, which is basically what the argument is, we respectfully submit is incorrect. And it seems pretty logical that what happened here is that what was important to the tribe was the recognition of the right to sustenance fish as a right as a part of their cultural heritage. And they got that under Section 6207. It was equally, if not more important to the state, as Mr. Reeves pointed out, that the boundaries of the reservation be limited only to the islands because once they get into the water, they get to regulate the water, and the status quo for over 200 years and ever since the colonists came has been state-exclusive regulation of the river. So those were two important points, and they each achieved those goals. Now, what probably no one thought was the practical implication of having that definition and then how it would affect the breadth of the geographical scope of the sustenance fishing exercise in 6207. And the reason why it was probably not on the top of the radar screen for the nation is because in 1980, you couldn't exercise sustenance fishing as a practical matter because there was no fishery, and the water was too dirty to eat the fish from the river. Now, it's 37 years later, and the river's been cleaned up, and it still is a practical matter, not really an issue because, as the states noted, all Maine Indians are allowed to fish for sustenance anywhere they want to in the state as practical matter. So again, what this case is really about is not about the exercise of sustenance fishing and where it can be done. It's about whether the Indians can regulate the river, and they have never been able to regulate the river, and the language is clear in the definition of the reservation that the reservation includes only the islands because the state wanted to retain exclusive control over the central artery that everyone was using in 1980. Thank you. Thank you. May it please the court. Maine has changed its position. In 1997, Maine Solicitor General Warren clearly stated, this is at JA 859, that an island landowner's title extends to the center of the channel between the island and the opposite shore, and that was in the context of describing the boundaries of the Penobscot Reservation. Thus, the boundaries of the Penobscot Reservation may generally be described as including the islands in the Penobscot River above Old Town and a portion of the riverbed between any reservation island and the opposite shore, and that was not an offhand remark. That was based on analysis of Maine common law precedent, which was correct. Now that rule applies unless... Excuse me. I go back to the very first question I asked in this argument. If the text of the statute is clear, what the Maine Solicitor General said 17 years after the statute was enacted can't change its meaning. Yes, Your Honor, that's true, but it's not clear because an island's legal definition is the edge of the island, the vegetation line, is it the high water mark, is it the low water mark, or do you keep going down? And in Pennsylvania, in the Susquehanna River, the Pennsylvania Supreme Court decided in 1810, the island ends, the upland ends at the high water mark of the river. Counselor, would you respond to the last comment that was made, that what this case is really about is whether the nation will get control over the river? It will get the control that it bargained for in the Settlement Act, which is hunting and trapping. And only that? Hunting and trapping, it will have joint authority, not for regulation, but for policing, for fishing. But not to patrol, not to have jurisdiction to patrol. Okay, so that's a different answer than the first answer you gave me. I don't think so, Your Honor, but to clarify... Why are they patrolling? Because the statute gave them... No, no, the functional purpose of... You say the outcome of this case has got to be that the nation gets the right to patrol the river up and down. For what purpose? It's a central part of their identity, that their islands and the river are their homeland, and they rely on these resources, both sustenance-wise and culturally. All right. I still don't understand the answer. Patrol for what purpose? To exclude people? To regulate what's going on? There are regulations about how one hunts and traps, and if someone is taking ducks out of season or trapping beaver in a way that's not permitted, then the wardens tell them that's not permitted and they get a ticket. And the state has no role to play in controlling the river and whether there will be overfishing? Oh, it does, Your Honor, because the history of the fishing is not inconsistent with having the land within the reservation. In Maine, the beds of rivers are owned not by the state... We're now repeating. Do you have anything else you'd like to say? I will. It's Mr. Smith's time. Your Honor, the only question before this court is the scope of the Penobscot Nation's exclusive authority over sustenance hunting, trapping, and fishing and its related authorities. Exclusive authority. Exclusive authority over sustenance hunting, trapping, and fishing and related authorities. You can't control a cultural and subsistence resource unless you have the ability to control the exploitation of that by others. And that's all that's at issue. I suppose the Maine Commissioner of Fishing and Wildlife finds that the Penobscot River needs a period of quietude in order to permit fish to restock. And the tribe says, the nation says, sorry, we don't agree. Who controls? Under section 6207, subpart 6, the commissioner can step in and take check and prevent the tribe from engaging that over-exploitation. We laid this out in our yellow brief. Everyone understood, so this is going in. Deputy Attorney General John Patterson testified in the public hearings on March 30, 1980, to discuss just this problem and he recognized in a question about Atlantic salmon fishing on the river, right across the river, that would be under the tribe's control and the state would have authority to step in if that hurt other stocks outside. Your Honor, I need to give the voice of the tribe in this case. It's often muffled. Sometimes you might call it muzzled. And here, the tribe's voice has to be heard because this was an agreement. This was a treaty substitute. And you can harmonize the problem of your plain language problem by employing Alaska Pacific fisheries. In Alaska Pacific fisheries, the court said that what was most important was how the tribe looked upon the adjacent submerged lands and related waters as part of the islands. The undisputed testimony across this case is that the Penobscots have always understood that there's no difference between the island surfaces where they maintain their homes and the river waters where they eat. All right. I still have a question that is not clear in my mind. Your opponents have said that they do not oppose in any way the sustenance of fishing by the tribe. That is a post-litigation attempt to avoid what was expressly stated in the letter of August 8, 2012, when the Attorney General wrote to the commissioners for Game Warden saying to address the respective regulatory jurisdictions of the Penobscot Nation in the state of Maine related to hunting and fishing. And that said, with the exception of the islands, Maine has exclusive regulatory jurisdiction. The Penobscot Nation has authority to regulate hunting and fishing on islands only. The river itself is not part of the Penobscot Reservation. This immediately drew into controversy. The scope of the authority is under Section 6207-1, 6207-4. And it immediately put the dignitary interest of the tribe as a sovereignty at risk and at harm because it undermined Section 303 of the nation's inland fish and game regulations, which are in the appendix at JA 969-70 and the existence of its permits. All of this goes to Atlantic salmon fishing and to its culture. It addressed traditional spearfishing of Atlantic salmon in those regulations. So the dignitary interest of the Penobscot Nation was immediately put in jeopardy by that letter. Thank you, Your Honor. Thank you.